ORIGINAL

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**FILED IN CLERK'S OFFICE**
U.S.D.C. Atlanta

AUG 0 9 2007

JAMES N. HATTEN, CLERK
By _____
Deputy Clerk

|  |  |
|---|---|
| COLUMBUS DRYWALL & INSULATION, INC., *et al*, on behalf of a class of similarly situated persons, | ) ) ) ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| MASCO CORPORATION, *et al*, | ) |
|  | ) |
| Defendants. | ) ) |

Civil Action File

No. 1:04-CV-3066-JEC

**FILED UNDER SEAL**

**HEARING REQUESTED**

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION.......................................................................... 1

COUNTERSTATEMENT OF FACTS ................................................. 5

I.     COMPETITION OCCURS IN DISCRETE LOCALIZED MARKETS ....... 7

II.    FIBERGLASS INSULATION PURCHASES VARY CONSIDERABLY AND ARE HIGHLY INDIVIDUALIZED ................... 8

III.   THE PRICE CONTRACTORS PAY FOR INSULATION IS THE PRODUCT OF INDIVIDUALIZED NEGOTIATIONS ............................ 11

IV.   CONTRACTOR PRICES VARY WIDELY ACROSS ALL DIMENSIONS ......................................................................... 12

ARGUMENT ............................................................................. 12

I.     PLAINTIFFS HAVE NOT ESTABLISHED THAT COMMON ISSUES PREDOMINATE OVER INDIVIDUAL ISSUES ...................... 12

     A.     Plaintiffs Must Demonstrate That They Can Establish Both The Alleged Conspiracy And Its Impact With Common Proof ............... 12

     B.     Plaintiffs Understate Their Burden Of Proving Impact With Common Evidence ........................................................... 17

     C.     Plaintiffs Completely Fail To Articulate Any Common Evidence Of Impact.......................................................... 19

         1.     Proof Of Market Structure Alone Is Insufficient To Establish Impact As A Matter Of Law..................................... 19

         2.     Plaintiffs' Ripple Effect Theory Implicates the Linkage Theory and Requires Individualized Analysis......................... 23

         3.     Plaintiffs' Argument That Price Competition Increased When Johns Manville and Guardian "Abandoned The Conspiracy" Does Not Establish Impact.................................. 25

4.    Plaintiffs Cannot Establish That Their Theory That Masco Led Price Increases To Market Would Result In Impact To All Class Members ................................................. 27

5.    Dr. Leitzinger's Statistical Analysis, Even If Accepted As Reliable, Does Not Constitute Common Proof of Impact....................................................................................... 30

a.    The Leitzinger Model Does Not Show Increased Spreads During The Conspiracy Period Across Class Members With Common Proof............................ 30

b.    Because Masco Will Rebut The Leitzinger Model On A Contractor By Contractor Basis, Common Issues As To Impact Will Not Predominate At Trial............................................................................... 35

D.    Plaintiffs' Proffered Methodology Is Not Plausible And Therefore Cannot Support Class Certification ..................................... 41

II.    THIS COURT SHOULD REJECT PLAINTIFFS' NEW ATTEMPT TO OBTAIN CLASS CERTIFICATION ON THEIR VERTICAL CONSPIRACY CLAIMS ................................................................. 45

A.    Plaintiffs Abandoned Any Argument To Obtain Class Certification On Their Vertical Conspiracy Claims............................ 45

B.    Plaintiffs Have Not Presented Common Proof That Would Support Class Certification On A Vertical Conspiracy ..................... 46

III.    A CLASS ACTION IS NOT THE SUPERIOR METHOD OF ADJUDICATING THIS DISPUTE ........................................................... 48

CONCLUSION ..................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*In re Agricultural Chemicals Antitrust Litig.*,
  1995 U.S. Dist. LEXIS 21075 (N.D. Fla. Oct. 23, 1995)................. passim

*Alabama v. Blue Bird Body Co., Inc.*,
  573 F.2d 309 (5th Cir. 1978) ............................................................ passim

*Allison v. Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) .................................................................. 49

*In re Aluminum Phosphide Antitrust Litig.*,
  893 F. Supp. 1497 (D. Kan. 1995).................................................... 25, 44

*Andrews v. AT&T*,
  95 F.3d 1014 (11th Cir. 1996) ................................................................ 49

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
  917 F.2d 1413 (6th Cir. 1990) ................................................................ 44

*Ash v. Tyson Foods, Inc.*,
  546 U.S. 454 (2006).................................................................................. 50

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990).................................................................................. 28

*In re Beer Distrib. Antitrust Litig.*,
  188 F.R.D. 557 (C.D. Cal. 1999)............................................................. 47

*Bell Atlantic v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) .................................................................. 16

*Blades v. Monsanto*,
  400 F.3d 562 (8th Cir. 2005) ............................................................ 41, 42

*Cable Holdings of Georgia Inc. v. Home Video*,
  825 F.2d 1559 (11th Cir. 1987) ......................................................... 30, 43

*In re Carbon Black Antitrust Litig.,*
    2005 WL 102966 (D. Mass. Jan. 18, 2005)............................................. 15

*In re Catfish Antitrust Litig.,*
    826 F. Supp. 1019 (N.D. Miss. 1993) ...................................................... 15

*Chestnut Fleet Rentals Inc. v. Hertz Corp.,*
    72 F.R.D. 541 (E.D. Pa. 1976) ................................................................ 35

*City of Pittsburgh v. West Penn Power Co.,*
    147 F. 3d 256 (3rd Cir. 1998)........................................................... 18, 42

*In re Commercial Tissue Prods.,*
    183 F.R.D. 589 (N.D. Fla. 1998)............................................................. 15

*In re Comp. of Managerial, Prof. and Technical Employees Antitrust
    Litig.,*
    No. 02-2924, 2003 U.S. Dist. LEXIS 22836 (D.N.J. May 22,
    2003) .................................................................................................... 47

*Cooper v. Southern Co.,*
    390 F.3d 695 (11th Cir. 2004) ................................................................ 50

*Daubert v. Merrell Dow Pharmaceuticals,*
    509 U.S. 579 (1993).................................................................................. 3

*In re Domestic Air Antitrust Litig.,*
    137 F.R.D. 677 (N.D. Ga. 1991) ............................................................ 14

*Exhaust Unlimited, Inc. v. Cintas Corp.,*
    223 F.R.D. 506 (N.D. Ill. 2004) ....................................................... 18, 42

*Federal Prescription Serv. v. American Pharm. Ass'n, ,*
    663 F.2d 253 (D.C. Cir. 1981)................................................................ 19

*In re Flat Glass Antitrust Litig.,*
    191 F.R.D. 472 (W.D. Pa. 1999) ............................................................ 15

*In re Foundry Resins Antitrust Litig.*,
   2007 WL 1236560 (S.D. Ohio May 2, 2007)........................................... 20

*Gen. Tel. Co. of the Southwest v. Falcon*,
   457 U.S. 147 (1982).......................................................................... 12, 17

*Gilchrist v. Bolger*,
   733 F.2d 1551 (11th Cir. 1984) ............................................................ 17

*In re Hotel Telephone*,
   500 F.2d 86 (9th Cir. 1974) ................................................................. 35

*Johnston v. HBO Film Mgmt., Inc.*,
   265 F.3d 178 (3d Cir. 2001) ................................................................ 17

*Karofsky v. Abbott Labs.*,
   No. CV-95-1009, 1997 Me. Super. LEXIS 316 (Me. Super. Oct.
   15, 1997) .......................................................................................... 35

*Kenett Corp. v. Mass. Furniture & Piano Movers' Ass'n*,
   101 F.R.D. 313 (D. Mass. 1984) ........................................................... 21

*Klay v. Humana*,
   382 F.3d 1241 (11th Cir. 2003) ...................................................... 15, 40

*Leegin Creative Leather Prods. v. PSKS Inc.*,
   127 S. Ct. 2705 (2007)....................................................................... 46

*Lundquist v. Sec. Pacific Auto. Fin. Servs., Corp.*,
   1992 U.S. Dist. LEXIS 22843 (D. Conn. June 9, 1992) ......................... 49

*Matsushita Elec. Ind. Co. v. Zenith Radio*,
   475 U.S. 574 (1986).......................................................................... 28

*In re Medical Waste*,
   2006 WL 538927 (D. Utah March 3, 2006) .......................................... 41

*Minnesota v. United States Steel Co.*,
   44 F.R.D. 559 (D. Minn. 1968) ........................................................... 49

*Newton v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
  259 F.3d 154 (3rd Cir. 2001) .................................................................. 41

*Nichols v. Mobile Board of Realtors*,
  675 F.2d 671 (5th Cir. 1982) ...................................................... 12, 14, 16

*In re Plywood Antitrust Litig.*,
  655 F.2d 635 (5th Cir. 1981) .................................................................. 21

*In re Polymedica Corp. Sec. Litig.*,
  432 F.3d 1 (1st Cir. 2005).................................................................... 41

*In re Polyproplylene Carpet*
  178 F.R.D. 603 (N.D. Ga. 1997) .......................................................... 21

*In re Potash Antitrust Litig.*,
  159 F.R.D. 682 (D. Minn. 1995) .......................................................... 15

*Robinson v. Texas Auto. Dealers Ass'n.*,
  387 F.3d 416 (5th Cir. 2004) ...................................................... 17, 18, 42

*Shumate v. National Ass'n. of Secs. Dealers, Inc.*,
  509 F.2d 147 (5th Cir. 1975) .......................................................... 14, 16

*Spanish Broadcasting Sys. of Fla. v. Clear Channel Communications,*
  *Inc.*,
  376 F.3d 1065 (11th Cir. 2004) .......................................................... 47

*Stein v. Reynolds Secs., Inc.*,
  667 F.2d 33 (11th Cir. 1982) .................................................................. 13

*Syufy Enter. v. American Multicinema, Inc.*,
  793 F.2d 990 (9th Cir. 1986) .................................................................. 20

*Szabo v. Bridgeport Machs., Inc.*,
  249 F.3d 672 (7th Cir. 2001) .................................................................. 17

*Telecomm Technical Services, Inc. v. Siemens Rolm Comm., Inc.*
  172 F.R.D. 532 (N.D. Ga. 1997) .......................................................... 21

*In re Terazosin Hydrochloride Antitrust Litig.,*
 220 F.R.D. 672 (S.D. Fla. 2004)............................................................. 15

*In re: Transit Co. Tire Antitrust Litig.,*
 67 F.R.D. 59 (W.D. Mo. 1975)................................................................. 16

*Weisfeld v. Sun Chem. Corp.,*
 No. 02-4478, 2004 U.S. App. LEXIS 277 (3rd Cir. Jan. 9, 2004).......... 47

*West v. Prudential Secur.,*
 282 F.3d 935 (7th Cir. 2002)................................................................... 41

*Williamson Oil Co. Inc. v. Philip Morris USA,*
 246 F.3d 1287 (11th Cir. 2003)............................................................... 43

*Windham v. American Brands, Inc.,*
 565 F.2d 59 (4th Cir. 1977)..................................................................... 14

## STATUTES

Fed.R.Civ.P. 23 Advisory Committee Notes.................................................. 50

Fed.R.Evid. 801(d)(2)(E)............................................................................ 7

## INTRODUCTION

This unjustified litigation has arrived at a remarkable juncture. Plaintiffs have abandoned their first three theories of liability, and now hope to convince this Court that Masco conspired with five manufacturers of fiberglass insulation to "artificially increase" the difference between Masco's prices and the prices charged to other fiberglass insulation contractors. Plaintiffs have also abandoned their first proposed class and the theory for certification of that class, and the Court has denied their motion for class certification. Now, however, having proposed a new class limited to 377 specific contractors based solely on the work of their new class expert, plaintiffs essentially tell the Court to ignore that expert and his analysis as well, tacitly admitting that the methodology he proffers is not sufficient to gain class certification. Plaintiffs suggest that the Court should only consider their expert's methodology as supportive of the notion of classwide impact, which instead should be inferred from the "market structure" and selected documentary evidence.

Plaintiffs' predicament is a direct result of the fact that this lawsuit does not address unlawful conduct, but rather seeks to prevent and punish legitimate business behavior by the largest rival of the plaintiff contractors. In their attempt to find a claim that would even appear to state a Sherman Act violation, plaintiffs ran through numerous iterations of their allegations before deciding that they

1

would allege a conspiracy to artificially increase the pre-existing and perfectly legal pricing advantage enjoyed by Masco as the dominant buyer in this oligopolistic industry.  Because this purported version of the conspiracy is not identified, described or even mentioned in any document, or in the testimony of any witness, plaintiffs (and their expert) have been understandably hampered in their ability to explain the exact nature of the conspiracy, or how it is supposed to operate.  Indeed, as Masco's motion for summary judgment makes clear, plaintiffs' claims fail as a matter of law because, while there admittedly are documents that discuss a "spread" or "gap" between Masco's price and the prices of other contractors, this evidence merely reflects the lawful discount that a large buyer deserves from its sellers.  There is absolutely no evidence of any unlawful agreement or the horizontal conspiracy that plaintiffs allege.  The supposed vertical conspiracies that plaintiffs fall back upon are nothing but alleged agreements between Masco and its suppliers that Masco will get a better price in recognition of its large purchase volume -- perfectly legal, everyday business interactions.

Plaintiffs' futile search for a theory of liability has now left them with a proposed class that is also exposed as an artificial construct.  Indeed, in formulating their proposed class of 377 contractors, plaintiffs simply jettisoned the great majority of fiberglass insulation contractors who they once claimed to represent.  Plaintiffs obviously believed that because their new, constricted class

was defined only by the results of their expert Dr. Leitzinger, the model employed by Dr. Leitzinger would constitute a plausible common methodology for demonstrating impact on those 377 class members. But it has become crystal clear that that is not the case.

Instead, it turns out that Dr. Leitzinger employed a standard of confidence in his results that even he admits does not comply with scientific standards. Dr. Leitzinger's results cannot distinguish between increased spreads vis-à-vis Masco and increased spreads vis-à-vis a large number of other contractors. His model would include in the class numerous contractors whose spreads actually *decreased* compared to Masco, as well as contractors whose comparative spreads both increased and decreased during the proposed class period, or whose spreads increased on purchases from one manufacturer and decreased on purchases from another, or whose spreads increased on one product but decreased on another. Numerous other inconsistencies plague Dr. Leitzinger's work, many the result of his decision to average together prices without regard to types of products, volume of purchases, or temporal differences.

As Masco has pointed out, for these reasons and many others, Dr. Leitzinger's report should be stricken pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). This Court need not exclude the report, however, to conclude that Dr. Leitzinger has not provided a plausible methodology

3

for demonstrating impact, much less a methodology that can demonstrate impact on all class members by common proof. Indeed, the very failings of Dr. Leitzinger's methodology make it inevitable that at trial, Masco would defend against his conclusions by introducing individualized evidence, contractor by contractor, showing that the supposed increase in spreads posited by Dr. Leitzinger either do not exist or are explained by market realities that Dr. Leitzinger ignored.

Too late, plaintiffs apparently realize that they cannot put all their eggs in Dr. Leitzinger's basket. Thus, Dr. Leitzinger's model is relegated to the back of plaintiffs' renewed motion, offered as support for the claim that the nature of the fiberglass insulation market would cause any increased spreads to impact all contractors. Ironically, plaintiffs have returned to the linkage theory already rejected by this Court, and which they themselves abandoned in changing their class definition. However, those arguments now carry even less weight, because they cannot be squared with their own expert's results, which show not universal impact but supposed impact only upon a subset of 377 contractors. Thus, far from supporting plaintiffs' motion for class certification, Dr. Leitzinger's results foreclose plaintiffs' claims.

In short, plaintiffs' second attempt to create a certifiable class fares no better than their original attempt to gain certification of a class of all contractors. Their renewed motion for class certification should be denied.

4

## COUNTERSTATEMENT OF FACTS

Plaintiffs devote 20 pages of their brief to a "statement of facts" and argument as to the "legality of Masco's conduct," none of which address the question of whether plaintiffs can show that common issues would predominate at a trial of this case.  The notable feature of plaintiffs' factual recitation is that plaintiffs still cannot explain how the alleged conspiracy supposedly operated. This issue is central, not only to the question of whether plaintiffs actually can prove a conspiracy, but also to whether they can do so with reliable, common evidence that it existed, and impacted all class members.

Although plaintiffs' articulation of their conspiracy theory is something of a moving target,[1] plaintiffs now allege that the manufacturers agreed with Masco to "maintain and increase" a spread as to each contractor by some unknown amount "relative to what it otherwise would have been."  (Pls.' Br. at 1.)  However, even after months of discovery and three expert reports, plaintiff cannot explain the nature or effect of this "amorphous" alleged conspiracy.  (Transcript of May 16,

---

[1]     Plaintiff have moved through at least three conspiracy theories in the course of this case, including their recently abandoned claim of a "minimum spread." However, most of the evidence that they cite as supporting the alleged conspiracy to "increase" the spread is exactly the same evidence that they used to support their "minimum difference" alleged conspiracy.  (August 9, 2007 Report of David P. Kaplan ("Kaplan II Rpt.") ¶ 9).

2007 Hearing ("Hearing Tr.") (Comments of Hon. Julie E. Carnes), A-783.)[2]

Plaintiffs do not set forth any facts that describe how and when the conspiracy started, or what the "spread" was between Masco and the prices of any other contractors at that time. They do not even claim that the alleged conspiracy involved an agreement as to the amount to increase the spread as to any contractor, or all of them, or the method of achieving it.

Plaintiffs' own expert, Dr. Leitzinger, admitted that he has absolutely no idea how the conspiracy started, was implemented, or worked. (November 17, 2006 Deposition of Jeffrey Leitzinger ("Leitzinger I Dep."), A-798-A-800). He conceded that "the mere fact that there was a spread between Masco's price and some unspecified number of other contractors during the base period doesn't tell you that there was a conspiracy existing during that base period." (Leitzinger I Dep., A-790-A-791).

The only "evidence" that plaintiffs provide to support their vague allegations are the same recycled documents that they claimed supported each previous version of the alleged conspiracy. Not one document mentions a conspiracy to "artificially increase" any price spread, or provides any direct evidence of a horizontal conspiracy. Instead, plaintiffs present a hodgepodge of documents and

---

[2]     All page numbers beginning with "A" are citations to the independently and consecutively paginated Appendix to Defendants' Opposition to Plaintiffs' Renewed Motion for Class Certification.

testimony purporting to show the application of the conspiracy to individual contractors -- some of whom are not even among the 377 contractors that Dr. Leitzinger ultimately places in the class. (*See e.g.* PA1294-95 (Walldesign Inc.); PA49 (McPherson Insulation); PA1300-01 (Select Insulation and Drywall); PA 1472-73 (All Interior Insulation); PA 1313-15 (Division 7 Insulation); PA1435 (Martex Insulation); PA1307 (84 Lumber)). This evidence does not reflect that Masco orchestrated an agreement among the suppliers even as to the contractors named in each document.[3] More importantly, documents relating to individual contractors obviously do not constitute common evidence of a nationwide conspiracy to increase a spread relative to class members.

Plaintiffs' statement of facts does nothing to support their request for certification of a class under Rule 23 and, indeed, only highlights why class certification is inappropriate in this unconventional antitrust case.

## I.   COMPETITION OCCURS IN DISCRETE LOCALIZED MARKETS

Competition for residential insulation occurs in markets that are highly individualized. Insulation manufacturers compete for the business of insulation contractors in small local markets rather than nationally. (A-879 (discussing a price change in the "Central Ohio market"); A-880 (discussing the "Charlotte

---

[3]    And, since almost all of this evidence consists of documents of the manufacturer defendants, it is hearsay as to Masco and inadmissible under Fed.R.Evid. 801(d)(2)(E). (*See* Reply Mem. In Supp. Of Defs.' Mot. For Summ. J., D.I. 462, at 10.)

market"); A-881 (discussing a price change in the "Platt City, MO market area"); *see also* March 15, 2006 Report of David P. Kaplan ("Kaplan Rpt. I"), A-47; Kaplan Rpt., A-487-A-488, A-498). Competitive interaction between Masco and other contractors, including the proposed class representatives, takes place at the local level. (Kaplan I Rpt., A-47-A-51; Kaplan II Rpt., A-487).

Contractors also view their competition as local. For example, Columbus Drywall admits that its geographic market is a 30-mile radius of downtown Columbus and the price it pays for insulation may "differ from prices paid in other areas of the country" because it is in a "different market area" from other contractors. (A-884-A-888, A-889-A-890; A-907 (agreeing that "market coverage" of Southland Insulators is the Washington D.C. metro with concentration on Northern Virginia suburbs); A-917 (stating that Delmarva Insulation competes "[i]n Delaware and the three counties in Delaware and part of the Eastern Shore of Maryland"); A-933 (stating that Leo Jones Insulation competes generally 125 miles from Tyler, Texas).

## II. FIBERGLASS INSULATION PURCHASES VARY CONSIDERABLY AND ARE HIGHLY INDIVIDUALIZED

Fiberglass insulation products are not homogenous and vary considerably by, among other things, quality, resistance to heat, facing, and intended application (Kaplan I Rpt., A-36-A-38). Manufacturers produce fiberglass insulation in different forms, including batts, rolls and blowing wool. (*Id.* at A-36-A-37).

8

These products are designed for and used in different applications; for example, batts are used in walls and flat ceilings while blowing wool is traditionally used in attics. (*Id.*). Manufacturers produce insulation products with different thermal conductively ratings, or "R-values." (*Id.*). Different products may be specified by local building codes that can vary "from state to state and community to community" or by location depending on climate. (*Id.* at A-37. *See also* A-898-A-899). CertainTeed sells over 200 different products, Guardian about 150 and Knauf over 175. (Kaplan I Rpt., A-36).

Price is not the only factor that contractors consider when purchasing residential insulation. (A-922 ("there are a lot of factors beside just the price," including "relationships, trust quality of materials [and] delivery"); Kaplan I Rpt., A-38-A-40). Contractors, including the named plaintiffs, do not always purchase the lowest priced product available. (A-918 (stating that he would buy material from a higher priced manufacturer because of "availability and quality"); A-919 (agreeing that he would pay "a premium" to avoid buying Guardian blowing wool); ("We don't buy from the guy with the lowest price and then not buy from the others"); A-936 ("a manufacturer may come to us with a lower price, and we still choose not to buy from them"); A-940; Kaplan I Rpt., A-38-A-40).

There is a wide variation in the size and frequency of insulation purchases by contractors. (Kaplan I Rpt., A-43-A-44). Some of the proposed class members

9

are members of buying groups, such as NICE, which allows them to "pool" their purchases to obtain a better price for insulation.   (*Id.* at A-44-A-45).   A contractor's location may dictate the types of insulation that it purchases due to building codes, weather, energy costs, and preferences of local builders or architects.   (*Id.* at A-45).   All of these factors are highly individualized market factors.

Manufacturers and distributors other than the defendants compete in the United States and sell fiberglass insulation directly to contractors.  Ottawa Fibre, a Canadian manufacturer, is a "low price competitor impacting the U.S." that has "pushed product across the border into New England, Western New York, and the Pacific Northwest" and "repeatedly sells well below the market." (*Id.* at A-66-A-69).   Similarly, Vitro Fibras, a Mexican supplier of residential insulation, has imported product "into border states especially Texas, New Mexico, Arizona and Southern California." (*Id.* at A-69).   There also is meaningful competition from cellulose and foam insulation products, which made significant inroads into the insulation industry during the proposed class period. (*Id.* at A-70-A-76).   Many insulation contractors purchase products from distributors instead of, or in addition to, manufacturers. (*Id.* at A-83-A-85).

## III.   THE PRICE CONTRACTORS PAY FOR INSULATION IS THE PRODUCT OF INDIVIDUALIZED NEGOTIATIONS

Prices paid by contractors for insulation are established by individualized negotiations between manufacturers and contractors.  Some manufacturers prepare and distribute "price lists" (*Id.* at A-61); however, contractors rarely, if ever, pay the list price.  (Deposition of John A. Del Roccili ("Del Roccili Dep."), A-948 ("nobody pays list price or rarely"); A-905 ("I don't think anybody pays that price"); A-935 ("I don't know of anybody paying the list price"); A-923).  Actual transaction prices paid by contractors often differ across customers.  (Declaration of John A. Del Roccili ("Del Roccili Decl."), A-1027).

- In some instances, contractors use the price they paid for the previous load of fiberglass insulation to negotiate a better price.  (A-1062-A-1064; A-891-A-892).

- In some instances, contractors use the prices charged by other manufacturers to negotiate a better price.  (A-893; A-900-A-903; A-921; A-940).

- In some instances, contractors use the price they want to bid for a job to negotiate a better price.  (A-938-A-939).

- In some instances, contractors use the prices that competitors are paying to negotiate a better price (A-1068; A-906, A-920).

- In some instances contractors use their purchasing power to negotiate a better price.  (A-1065-A-1067; A-1069-A-1070).

## IV.   CONTRACTOR   PRICES   VARY   WIDELY   ACROSS   ALL DIMENSIONS

Masco's expert economists Daniel L. Rubinfeld and David P. Kaplan conducted analyses of the transaction data from manufacturers. (January 11, 2007 Report of Daniel L. Rubinfeld ("Rubinfeld I Rpt."), A-1107-A-1155; Kaplan I Rpt.). Dr. Rubinfeld found that prices that contractors paid during the class period varied significantly, from below Masco's price to as much as 100% above it. (Rubinfeld I Rpt. at A-1134-1135). Price variations existed on both an absolute and a percentage basis. (Kaplan I Rpt., A-56-A-60). There was no uniform "spread" or "gap" between Masco's price and the price of any other contractor. (Rubinfeld I Rpt., A-1120; Kaplan I Rpt., A-56-A-60).

## ARGUMENT

## I.   PLAINTIFFS HAVE NOT ESTABLISHED THAT COMMON ISSUES PREDOMINATE OVER INDIVIDUAL ISSUES

### A.   Plaintiffs Must Demonstrate That They Can Establish Both The Alleged Conspiracy And Its Impact With Common Proof

Class actions are not, as plaintiffs suggest (Pls. Br. at 20), the mechanism of choice for resolution of private antitrust actions. Rather, the device is designed only for cases in which the "issues involved are common to the class as a whole…" *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982) (citation omitted); *Nichols v. Mobile Board of Realtors*, 675 F.2d 671 (5th Cir. 1982) (affirming decertification of class because plaintiffs did not prove that questions

common to the class in antitrust price fixing case predominated over questions affecting individual class members).[4]

Plaintiffs concede that to prevail on this motion, they must establish that they will use common proof to show a violation of the antitrust laws, injury to each class member, and damages.  (Pls.' Br. at 25.)  But they try to make an end-run around two of these elements by insisting that "the predominant issue in this case is whether the defendants conspired to maintain and increase the spread between the prices paid for insulation by class members and Masco." (*Id.* at 1.)  Plaintiffs claim that they are entitled to class certification because they will introduce common proof of the conspiracy.  (*Id.*)  As discussed below, even plaintiffs' conspiracy proof is not common, but also their articulation of the standard for class certification is incorrect.

Plaintiffs take this position, of course, because they are fully aware that they do not have common evidence to demonstrate that the alleged conspiracy would impact all class members.  But the law is quite clear that proof that defendants conspired to violate the antitrust laws does not, by itself, entitle plaintiffs to proceed with a class action.  The seminal cases in this circuit recognize that "the issue of liability in antitrust cases includes not only the question of violation, but

---

[4] In *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

also the question of fact of injury, or impact." *Alabama v. Blue Bird Body Co.,
Inc.* 573 F.2d 309, 320 (5th Cir. 1978), relying on *Shumate v. National Ass'n. of
Secs. Dealers, Inc.*, 509 F.2d 147, 155 (5th Cir. 1975) (affirming denial of class
certification where proof of injury to each class member was "critical for the
determination of defendants' liability to any individual"). This is because "[t]he
gravamen of the complaint *is not the conspiracy*; the crux of the action is injury,
individual injury. *Blue Bird*, 573 F.2d at 326. "[W]hile a case may present a
common question of violation, the issues of injury and damage remain the critical
issues in [such a case] and are always strictly individualized." *Id.* quoting
*Windham v. American Brands, Inc.*, 565 F.2d 59, 66 (4th Cir. 1977) (emphasis
added) (internal citations omitted); *Nichols,* 675 F. 2d at 679 (affirming
decertification where plaintiffs did not "advance any viable theory employing
generalized proof to establish the fact of damage"). This Circuit places "great
significance" and "the utmost importance" on the impact issue in evaluating the
propriety of certifying a class because impact is a "question unique to each
particular plaintiff and one that must be proved with certainty." *Blue Bird*, 573
F.2d at 320, 324, 327. "Proof of impact" is "the key element in determining
whether common issues will predominate" in an antitrust case. *In re Domestic Air
Antitrust Litig.*, 137 F.R.D. 677, 689 (N.D. Ga. 1991) (internal quotations omitted).

14

In all of the cases that plaintiffs cite for the proposition that the conspiracy claim alone was sufficient to support class certification, the courts initially determined in each such case that plaintiffs' proposed evidence to establish the existence of an antitrust conspiracy was *common* to the putative class members. But the commonality question differs from the predominance one.  In each of plaintiffs' cited cases, the court did not stop the analysis when it determined that the existence of the conspiracy was a common question; it went on to analyze separately whether plaintiffs presented a common methodology to prove that the alleged conspiracy *impacted* each class member before certifying the class.  *See, e.g., In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 696-697 (S.D. Fla. 2004); *In re Carbon Black Antitrust Litig.*, 2005 WL 102966, **15-16 (D. Mass. Jan. 18, 2005); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 485-487 (W.D. Pa. 1999).   Indeed, several of the cases that plaintiffs cite hold explicitly that "a mere charge of conspiracy does not mean that common questions predominate." *In re Commercial Tissue Prods.*, 183 F.R.D. 589, 595 (N.D. Fla. 1998); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1039 (N.D. Miss. 1993) (same); *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 693 (D. Minn. 1995) ("[a] mere allegation of price-fixing will not satisfy Rule 23(b) predominance requirement").[5]

---

[5]      Plaintiffs' argument that *Klay v. Humana*, 382 F.3d 1241 (11th Cir. 2003),

Even if the conspiracy proof is common, then, this Court cannot certify a class if the impact proof is individual.[6]  *Nichols*, 675 F.2d at 677 (affirming decertification for lack of common proof of impact); *Shumate*, 509 F.2d at 155 (affirming denial of certification where, even if conspiracy were subject to common proof, the "controlling question" of impact was not); *In re Agricultural Chemicals Antitrust Litig.*, 1995 U.S. Dist. Lexis 21075 (N.D. Fla. Oct. 23, 1995) (denying class certification because plaintiff failed to establish common proof of impact); *Bell Atlantic v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("we have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b) predominance."). Plaintiffs,

---

establishes that certification is permissible on the issue of conspiracy alone is also wrong. Although the *Klay* court determined that common issues of fact concerning the evidence of the conspiracy were "quite substantial" and common to the class, the court also held that "the circumstantial evidence that c[ould] be used to show [impact] [wa]s common to the whole class." *Id.* at 1258-1259.

[6]     Here, even plaintiffs' conspiracy proof is not common, consisting, as it does, of documents relating to the operation of the alleged conspiracy as to individual contractors. Without common proof showing a nationwide conspiracy to increase a spread as to all independent contractors, plaintiffs fail to satisfy the predominance test even with respect to the conspiracy. *Blue Bird*, 573 F.2d 323 (denying class certification because proof of a conspiracy in one state did not constitute common proof of a nationwide conspiracy); *In re: Transit Co. Tire Antitrust Litig.*, 67 F.R.D. 59, 73 (W.D. Mo. 1975) (denying class certification where "[p]roof of the factual allegations of the complaints concerning violation and injury will necessarily vary from [plaintiff to plaintiff], as it does not necessarily follow that proof of the factual allegations as to one plaintiff will establish that fact as to other plaintiffs and class members").

therefore, must address the question whether the conspiracy that they allege, if proven, caused each class member to pay more than it would have paid in the absence of a conspiracy, and whether they can show that through common proof.

### B.   Plaintiffs Understate Their Burden Of Proving Impact With Common Evidence

Plaintiffs initially argued on class certification that that they meet their predominance burden so long as their expert puts forward a "plausible" method of showing impact through generalized class-wide proof.  (Pls.' Mem. in Support of Mot. for Class Cert., D.I. 347, at 31-32.)   Of course, this contention is entirely inconsistent with *General Telephone,* where the Supreme Court held that the trial court must conduct a "rigorous analysis," which includes "prob[ing] behind the pleadings" to analyze the evidence necessary to establish plaintiffs' claims and defendants' defenses. *Gen. Tel.,* 457 U.S. at 160; *see also Gilchrist v. Bolger,* 733 F.2d 1551, 1555 (11th Cir. 1984) (*citing General Tel. Co).*[7]

While plaintiffs repeat their "plausible methodology" contention in this renewed motion (Pls.' Br. at 31), they also argue that they can prove impact

---

[7]      Other circuits have held similarly.  *See, e.g., Robinson v. Texas Auto. Dealers Ass'n.,* 387 F.3d 416, 421 (5th Cir. 2004); *Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 186-87 (3d Cir. 2001) ("analysis by examining the elements of the underlying cause of action ... is critically important to the predominance determination."); *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 675 (7th Cir. 2001) ("[t]he proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it.").

without the Leitzinger model (undoubtedly recognizing the fatal infirmities that Masco has already identified in Dr. Leitzinger's work).   Plaintiffs argue that "impact does not require quantitative proof" and that all they need to do is prove that the conspiracy "materially contributed to the price the class members paid," or that it "interfered with free market competition that would have driven prices down." (Pls.' Br. at 30-31.)

This argument, quite simply, is nonsense.   A contractor is not impacted unless it paid a price during the alleged conspiracy period that was higher than it would have paid absent a conspiracy.   *Robinson v. Tex. Auto Dealers Assn.*, 387 F.3d 416, 422 (5th Cir. 2004) (to demonstrate impact each plaintiff must prove a "purchase at a price higher than the competitive rate") (quoting *Blue Bird*, 573 F.2d at 317); *City of Pittsburgh v. West Penn Power Co.*, 147 F. 3d 256, 265 (3rd Cir. 1998) (antitrust plaintiff "cannot obtain damages without showing that he actually paid more than he would have paid in the absence of the violation"); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (N.D. Ill. 2004) (showing of antitrust injury requires proof "that plaintiff paid more than the price that would have existed 'but for' the alleged conspiracy").   On a motion for class certification, plaintiffs must prove (by a preponderance of the evidence, as they concede (Pls.' Br. at 30)) that they will actually use reliable, common proof to establish that each class member paid a price higher than it would have paid in the

18

absence of conspiracy.  Proving that a conspiracy "contributed to the price" that class members paid, or "decreased price competition" says absolutely nothing about whether the class members actually paid a price higher than they otherwise would have paid.  None of the allegedly common evidence that plaintiffs recite, including, most certainly, the Leitzinger model, comes close to meeting this burden.

### C.   Plaintiffs Completely Fail To Articulate Any Common  Evidence Of Impact

#### 1.   Proof Of Market Structure Alone Is Insufficient To Establish Impact As A Matter Of Law

Plaintiffs first argue that they will present common evidence of impact through Dr. Leitzinger's opinion that, given the "competitive structure" of the fiberglass insulation market, the conspiracy alleged "would create substantial harm to competition throughout the relevant market" and "would play a role in pricing for all direct purchaser class members."  (Pls.' Br. at 32.)  But plaintiffs' burden here is to present common evidence that impact *in fact* happened, not common evidence that it "would normally" occur or "would be expected" to occur, which is all that Dr. Leitzinger is able to conclude from his examination of market structure.  (Leitzinger Rpt., A-681).  "[I]impact is a question unique to each particular plaintiff and one that must be proved with certainty."  *Blue Bird*, 573 F.2d at 327 (internal citation omitted); *Fed. Prescription Serv. v. Am. Pharm. Ass'n*, 663 F.2d

253, 268 (D.C. Cir. 1981)("the 'fact of injury" must be 'certainly proved'").[8]  And of course "[t]he requirement that plaintiffs show antitrust impact is in no way lessened for plaintiffs in a class action." *In re Agricultural Chems. Antitrust Litig.*, No. 94-40216, 1995 U.S. Dist. LEXIS 21075, * 13 (N.D. Fla. Oct. 23, 1995).

Plaintiffs argue that "a number" of courts have certified antitrust claims based upon "expert analyses of the affected market comparable to the opinion offered by Dr Leitzinger." (Pls.' Br. at 33.)  Plaintiffs rely principally upon two horizontal price fixing cases, *In re Foundry Resins Antitrust Litig.*, 2007 WL 1236560 at *17-18 (S.D. Ohio May 2, 2007) and *In re Plywood Antitrust Litig.*, 655 F.2d 635 (5th Cir 1981).  However, those cases involved conspiracies to fix the list price of a fungible product, such that each purchaser's price was thereby affected.  These cases have no applicability to plaintiffs' claim here, where they do not allege that the defendants conspired to fix a list price, or raise the list price, or increase all prices by a certain amount, or fix prices to particular customers.  (Del Roccili Dep., A-944-A-945, A-947, A-949-A-950).  For this reason, "[t]he cases relied upon by plaintiff, involving a uniform supracompetitive price for a fungible product, are inapposite to this case.  In such cases, proof of purchase is sufficient to establish impact and is, thus, susceptible to generalized proof." *Kenett Corp. v.*

---

[8]    This standard is in contrast to the more lenient standard for proof of the amount of damages. *Syufy Enter. v. American Multicinema, Inc.* 793 F.2d 990, 1002 (9th Cir. 1986) ("proof of the amount of damages is governed by a less stringent standard of proof than is the fact of injury.")

*Mass. Furniture & Piano Movers' Ass'n*, 101 F.R.D. 313, 316 (D. Mass. 1984),
citing *Blue Bird*, 573 F.2d at 324.[9]

Other courts in this district have rejected the idea that generalized market
evidence can establish impact with certainty on a classwide basis.  As the court
said in *In re Polyproplylene Carpet Antitrust Litig.*, a case upon which plaintiffs
heavily rely, "[t]he Court cannot presume that, simply because Plaintiffs have
alleged a national price fixing conspiracy, plaintiffs' proof of antitrust impact will
be common to all plaintiffs and will predominate at trial."  178 F.R.D. 603, 620
(N.D. Ga. 1997).  To the same effect is *Telecomm Technical Servs. v. Siemens
Rolm Commc'n Inc.*, which held that plaintiffs fail to satisfy their burden of using
common proof to show impact by relying on generalized evidence.  172 F.R.D.
532, 548 (N.D. Ga. 1997).

Moreover, even if plaintiffs were correct that such generalized proof of
market conditions could legally support class certification, their own expert's
analysis destroys the contention that such a demonstration can be made here.  If
plaintiffs were correct, all purchasers of all insulation products, not just the 377
that Dr. Leitzinger's study identifies, would have experienced an increased spread
relative to Masco during all the years of the alleged conspiracy.  (Kaplan II Rpt.,

---

[9]      Moreover, plaintiffs' statement that the plaintiffs in *Plywood* presented no
statistical proof of impact but instead relied on their expert's application of
economic principles to the market (Pls.' Br. at 34) is not supported by the opinion.
*Plywood*, 655 F.2d at 635-36.

A-492-A-493).   But this is not at all the case.   Dr. Leitzinger performed his analysis on 438 direct purchasers of insulation products, but only 377 show an increased spread relative to Masco.   If his theory that the market structure would necessarily result in impact to all purchasers were true, all would show such an increased spread. (Kaplan II Rpt., A-492-A-493).[10]

Dr. Leitzinger's definition of the class includes contractors who experienced an increased spread as against Masco for either batt or blow, even if the particular contractor was impacted on one of the products but not the other.   But, if the market structure alone would mean that the alleged conspiracy would impact all class members, then one would expect to see increased spreads on all products that each contractor purchased.   (Rubinfeld II Rpt., A-1161).   However, of the 286 proposed class members that bought both products, and that Dr. Leitzinger concludes experienced an increased spread relative to Masco, 36 percent of those contractors did not experience an increase relative to Masco on both products. (Rubinfeld II Rpt., A-1162-A-1163).[11]   Dr. Leitzinger's own data belie his opinion

---

[10]   Moreover, Dr. Leitzinger did not even try to run his model on hundreds of other contractors in his own database for whom he had data, suggesting that the model does not work for them. (Kaplan II Rpt., A-495-A-497).

[11]   Dr. Leitzinger's analysis identifies contractors as impacted if his statistics show that it is more likely than not (more than a 50 percent chance) that their spread actually increased relative to Masco. (Leitzinger Rpt., A-688-A-689). Generally accepted economic and statistical standards, however, permit such a conclusion only if the confidence level of the results is at the 95 percent level. (Kaplan II Rpt., A-489-A-490; Rubinfeld I Rpt., A-1126).   At that level, even Dr.

that common evidence of the market structure would mean that a conspiracy such as plaintiffs posit would impact all purchasers.[12]

### 2.   Plaintiffs' Ripple Effect Theory Implicates the Linkage Theory and Requires Individualized Analysis

Plaintiffs next suggest that documents and testimony in the record show that "contractor prices are interrelated and that changing price for even a limited number of contractors soon affects the market." (Pls.' Br. at 35.)  But the evidence that plaintiffs cite does not come close to proving the market-wide impact that they claim.   For example, they cite the testimony of CertainTeed employee Jeff Templeton that, when prices move in the market place, "over a period of time they tend to affect everybody else's price."   (Pls.' Br. at 35.)   This vague and unsupported comment cannot possibly substitute for expert analysis and constitute common proof of impact on all contractors.  General evidence that conduct "tends to affect" prices is hardly proof of impact "with certainty." *Blue Bird*, 573 F.2d at 327.  Moreover, plaintiffs' experts agree with defendants' expert, Mr. Kaplan, that prices for fiberglass insulation vary widely, and the only explanation that plaintiffs

---

Leitzinger's study would find that not quite half of the class members were impacted by an increased spread relative to Masco  on both products.

[12]    Moreover, the actual market realities identified in Mr. Kaplan's first report contradict the predicates of Dr. Leitzinger's analysis. (Kaplan I Rpt., A-51-A-53, A-66-A-77).  The market contains manufacturers who are not defendants, products that are not subject to the alleged conspiracy, and highly idiosyncratic negotiations that form the basis for the prices contractors paid. (*Id.*).

have offered as to how price changes allegedly "spiral through the rest of the marketplace" (Pls.' Br. at 35) is the linkage theory of Dr. Del Roccili.

As a reminder, Dr. Del Roccili claimed that, if one contractor's price was affected by the alleged conspiracy, other contractors would feel less competitive pressure and cease aggressive bargaining with their own suppliers to achieve a lower price. But, as defendants have previously explained, that theory requires an analysis of the effect of lessened competition in local markets on each contractor. (Defs.' Opp. to Pls.' Mot. for Class Cert., D.I. 359, at 20-31.) This Court has already said that Masco's argument that the linkage theory requires individualized proof is "powerful." (July 20, 2007 Order and Opinion, D.I. 482, at 28.) Thus, without some explanation other than Dr. Del Roccili's as to how the increase of a spread between Masco and a customer in one localized market would affect all other contractors, the anecdotal testimony and documentary evidence that plaintiffs cite does not constitute common proof of impact.[13]

---

[13]    Moreover, if the anecdotal evidence that plaintiffs cite that all contractor prices are interrelated constituted common proof of impact, then one would expect to see that all purchasers, of all insulation products, would have experienced an increased spread relative to Masco in all years of the alleged conspiracy. (Kaplan II Rpt., A-492-A-495; Rubinfeld II Rpt., A-1159). As Dr. Rubinfeld has found, this result simply is not supported by Dr. Leitzinger's own model, since contractors do not exhibit the same pattern with respect to increased spreads across products and time. (Rubinfeld II Rpt., A-1159-A-1161, A-1189-A-1217). The increased spreads that Dr. Leitzinger does identify also vary widely, from less than one cent to forty times that amount; such disparate evidence belies the claim that fiberglass insulation prices are interrelated. (Kaplan II Rpt., A-501, A-553-555).

24

3.     **Plaintiffs' Argument That Price Competition Increased When Johns Manville and Guardian "Abandoned The Conspiracy" Does Not Establish Impact**

In their search for common proof of impact, plaintiffs also offer "proof" that, in 2004, "the breakdown in the respective relationships of Guardian and JM with Masco spurred increased price competition for sales to independent contractors." (Pls.' Br. at 39.)  This, they say, is documentary evidence of the "before and after story" of this conspiracy, "independently of the statistical evidence" that they obviously recognize fails to meet their burden.  (*Id.*)

First, documentary evidence that supposedly shows that price competition increased, whatever that means, does not prove that all class members paid a price higher than they otherwise would have paid in the absence of a conspiracy. Moreover, a "before and after" model is a recognized method of proving impact only if done correctly.  Isolated references to documents that complain about increased price competition from a rival in the time period after the alleged abandonment of the purported conspiracy obviously do not constitute a "method" of proving impact on a class-wide basis during the conspiracy period.   A recognized before and after model requires a rigorous analysis to assure that the only thing affecting the price in the after period is the absence of conspiracy.  *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1503 (D. Kan. 1995).

Plaintiffs' attempt to demonstrate through anecdotal evidence what the analysis of their expert does not establish simply does not meet this standard.

Moreover, the evidence that plaintiffs cite does not support their assertion that price competition "broke out" in 2004, the "after" period of their conspiracy theory.  Plaintiffs cite only a handful of documents reflecting pricing in 2004, none of which reflect a generalized national "outbreak" of price competition and which therefore do not constitute a method of generalized proof that would show impact to all 377 contractors.[14]

Indeed, plaintiffs' own statistical analysis does not support the assertion that Guardian's and Johns Manville's abandonment of the purported conspiracy by 2004 "would have extended throughout the market due to the interrelationship of contractor prices." (Pls.' Br. 35)  If plaintiffs were correct, then the data would show that all or virtually all of the 377 proposed members of the class benefited from a reduced spread relative to Masco in 2004, on all products.  In fact, only 135 of the contractors that purchased batts (57 percent) saw a statistically significant decline in their spread relative to Masco in the After period.  (Rubinfeld II Rpt., A-

---

[14]    PA318-319 discusses an approach towards Masco without discussing any impact on prices.  Four documents (PA 286 PA287, PA289, PA290) each only reference pricing to an individual contractor.  Four other documents (PA10, PA23-24, PA320, PA321) discuss pricing only in discrete regions.   Many other documents that plaintiffs cite (e.g., PA25-26, PA316, and PA259) deal with a period (early 2003) when the alleged conspiracy was supposedly in full swing, and therefore also do not support plaintiffs' argument.

1165, A-1219). Even fewer contractors -- only 49 -- saw a reduction in their prices

relative to Masco for blow products. (23 percent of contractors purchasing blow).

(*Id.*). These results are completely inconsistent with the claim that all contractor

prices are interrelated, and with the argument that "price competition broke out"

when two manufacturers allegedly changed their conduct.[15] Certainly a jury would

have to look contractor by contractor in 2004 to decide if this assertion were true.

> ### 4.   Plaintiffs Cannot Establish That Their Theory That Masco Led Price Increases To Market Would Result In Impact To All Class Members

Plaintiffs also argue that their theory that Masco allegedly agreed to "lead

the price increases to market" in exchange for the manufacturers' agreement to

maintain the spread provides another basis for inferring class-wide impact. (Pls.'

Br. at 40-41). But plaintiffs have completely failed to explain how Masco's

competitors would be adversely impacted if Masco agreed to accept a price

increase and pass it on to its own customers. It is well established that a

competitor does not suffer antitrust injury if a rival raises its price. That is

---

[15]     This evidence also rebuts plaintiffs' argument that the "reduction in spreads" that, they say, resulted from Guardian's and Johns Manville's abandonment of the alleged conspiracy in 2004 "strongly supports" an interpretation that "the spread conspiracy had raised independent contractor prices higher than they would have been absent that conspiracy." (Pls.' Br. at 43-44.) First, such an argument proves nothing; a decrease in the spread between Masco and independent contractors does not mean that the price that the contractor paid during the conspiracy period was higher than it would otherwise have been. More importantly, however, Dr. Leitzinger's model does not show that spreads were reduced in 2004 as to all members of the class.

because, under those circumstances, the competitor has actually benefited. It has an opportunity to either raise its prices or to undercut the company increasing prices and obtain more customers. As the Supreme Court noted in *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 582-583 (1986), "[Competitors cannot] recover damages for any conspiracy by petitioners to charge higher than competitive prices" because such conduct "could not injure [plaintiffs];" they would "stand to gain from any conspiracy to raise the market price..." *See also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337 (1990) (noting that, even if the defendant's conduct "acquired all of the attributes of a minimum-price-fixing scheme," a dealer-competitor would still not suffer antitrust injury because "higher ARCO prices would have worked to [the competitor's] advantage.")

The idea that Masco supposedly agreed to accept and pass on the suppliers' price increases as a *quid pro quo* of obtaining an increased spread raises a host of individual issues and conceptual difficulties. First, while plaintiffs claim that Masco agreed to "lead" price increases, they have not presented a method of proof using common evidence that Masco did so and thereby impacted other contractors. Dr. Leitzinger has admitted that, although he "thinks" that there was "at least some impact" from this alleged conduct, the only work that he did with respect to it was "tabulating and chronicling the history of certain price increases" and he did not

28

attempt to present any evidence that this aspect of the conspiracy impacted all class members.  (Leitzinger I Dep., A-794, A-795-A-797).  His bare assertion that he thinks that this alleged conduct impacted all class members (never explaining why he can prove it only as to some of the direct purchasers, on some products, for some years) cannot constitute common evidence of impact.

Second, if plaintiffs could offer any theory of cognizable impact from this allegation, it would necessarily require an individual examination of each localized market.  That is because whether Masco passed on any supplier price increase *i.e.*, raised its selling prices to its customers, is a decision that would have been made in each local market in which Masco and the plaintiff contractors compete.  (Kaplan II Rpt., A-487-A-488).  Indeed, Masco personnel have testified that selling prices are managed locally, by Masco's local branches.  (A-1072-A-1073).  Thus, if the conspiracy's impact requires an analysis of whether Masco actually passed on price increases from the other defendants, these are inherently individual questions, as are any consequential impacts on class members.  (Kaplan II Rpt., A-487-A-488).   In any event, plaintiffs have a complete failure of proposed proof on this issue.

### 5. Dr. Leitzinger's Statistical Analysis, Even If Accepted As Reliable, Does Not Constitute Common Proof of Impact

#### a. The Leitzinger Model Does Not Show Increased Spreads During The Conspiracy Period Across Class Members With Common Proof

Lastly, plaintiffs claim that Dr. Leitzinger's statistical analysis provides "yet more evidence of classwide impact." (Pls.' Br. at 41.)  It is notable that this study is the hallmark of plaintiffs' proof of impact, and the only (purportedly) rigorous evidence that they present, yet they relegate it to their fifth argument, and do not even claim that this Court can certify the class on the basis of Dr. Leitzinger's model alone.[16]

Plaintiffs assert that Dr. Leitzinger's model shows that each of the 377 contractors experienced "widening price spreads" during the alleged conspiracy period, a period of "generally declining and stagnant prices," and a "reduction in spreads in 2004" after Johns Manville and Guardian allegedly abandoned the conspiracy. (Pls.' Br. at 44.)

---

[16]    Given that they have presented no other common method of proving impact, the fact that plaintiffs do not ask the Court to rely on the Leitzinger model alone says volumes about their inability to proffer a methodology for demonstrating impact by common proof.  Indeed, this concession alone should doom plaintiffs' motion.  Of course, the Leitzinger model is the only basis for plaintiffs' definition of the proposed litigation class of 377 specific contractors.  If the Leitzinger model cannot support class certification, then there is no justification at all for certification of a litigation class.

To get to a jury in an antitrust case, plaintiffs must show "a causal relationship between the antitrust violation [alleged] and the injury [sustained]. *Cable Holdings of Georgia Inc. v. Home Video*, 825 F.2d 1559, 1561 (11th Cir. 1987). In a class action, plaintiffs must make this showing with common proof. *Agricultural Chems.*, 1995 U.S. Dist. LEXIS 21075, at * 13. Thus, if the Leitzinger model constituted common proof of impact from the conspiracy that plaintiffs allege, it would show that each identified contractor's spread increased during the alleged conspiracy period, as compared to both 1998 and 2004, the purported non-conspiracy years. (Rubinfeld II Rpt., A-1162). That, however, is not what Dr. Leitzinger's model shows.

Dr. Rubinfeld discovered that "the apparent commonality of Dr. Leitzinger's results across all of the proposed class members is an illusion that flows from the artificial generality of Dr. Leitzinger's presentation of his model." (Rubinfeld II Rpt., A-1171). This is because, for each contractor, Dr. Leitzinger averages together (1) prices in 1998 and 2004 (the "Base Period) and (2) prices in 1999-2003 (the "Affected Period"). (Leitzinger Rpt., A-687-A-688). Dr. Leitzinger includes the 377 contractors in the proposed class because he found, using these averages, that their spreads relative to Masco increased as between those two periods. (*Id.* at A-688-A-689).

31

Dr. Rubinfeld found, however, that these averages mask proof that differs among many contractors in the class as to whether they were impacted by the alleged conspiracy.   The Leitzinger model includes as members of the class 89 contractors whose spreads on batts were *lower* during the Affected Period than in the Before Period, the opposite of what impact requires.  (Rubinfeld II Rpt., A-1164, A-1218).  Fully 53 percent of contractors purchasing batt products did not have a statistically significant spread increase at all from the Before period (1998) to the Affected Period.[17] (*Id.*).

Similar results, showing the absence of impact or the lack of statistically reliable evidence of impact for many contractors in the proposed class, exist with respect to blow products, and for both batt and blow products with respect to the After Period as well:

- Twenty-eight contractors in the proposed class had a lower spread for blow in the Affected Period than in the Before Period.  (Rubinfeld II Rpt., A-1165, A-1218).  Fully 47 percent of the contractors in the proposed class that purchased blow did not have statistically significant spread increases as between the Before Period and the Affected Period. (*Id.*).

- Ninety-eight contractors had a lower spread for blow in the Affected Period than in the After Period.  (Rubinfeld II Rpt., A-1165, A-1219).

---

[17]    Dr. Leitzinger admits that economists, including himself, normally employ a 5 percent statistical significance test in assessing statistically reliability. (Leitzinger Dep., A-873).  He used a "more likely than not" standard for including contractors in the class at the direction of counsel for plaintiffs. (*Id.*)  This approach renders his study unreliable.  (*See* Motion To Exclude The Expert Testimony Of Jeffrey Leitzinger, D.I. 434, at 22-23).

Only 23 percent had a statistically significant spread between the Affected Period and the After Period. (*Id.*).

- Sixty-seven contractors purchasing batt had lower spreads during the supposed conspiracy than in the After Period. (*Id.*). Only 57 percent had statistically significant spreads between the Affected Period and the After Period. (*Id.*).

The individual nature of these results is further demonstrated by the fact that many different contractors did not suffer impact under each of these different measures. In fact, very few exhibited a pattern of increased spreads across product categories and the Before and After Periods. 202 contractors, or 54 percent of the proposed class, had lower spreads during the Affected Period than during either the Before Period or the After Period for either batt or blow products. (*Id.* at A-1165-A-1166). And only 58 of the proposed class members, 15 percent, had statistically significant spread increases for both batt and blow, relative to both the Before and After Periods. (*Id.* at A-1166).[18] So, only 15 percent of the proposed class exhibited the pattern that would be predicted if the conspiracy caused spreads to increase during the conspiracy years as compared to the years before and after it. (*Id.*).

These findings, of course, call into question whether plaintiffs can prove a conspiracy to the jury at all. But, for purposes of this motion, these results establish that the Leitzinger model is not common proof of impact from the

---

[18] There would still be individualized issues even with respect to these 58 contractors concerning whether the pattern as to each is consistent with impact from a national conspiracy.

conspiracy alleged because the underlying evidence under Dr. Leitzinger's own model varies widely among proposed class members.  In order to determine if each contractor of the 377 actually experienced an increased spread during the conspiracy period consistent with the conspiracy alleged, a jury would have to look contractor by contractor at the differing, and individual, statistical evidence. For example:

- ABC Insulation and Supply Co. saw its spread decrease during the After Period for both batt and blow.  Moreover, during the Affected Period ABC's spread for batt was lower relative to the averaged Before and After Periods, and the spread for blow was higher, but not by a statistically significant amount.  (*Id.* at A-1169).  The jury could well conclude that this pattern is inconsistent with impact to this contractor.

- Alcal Arcade, another member of the proposed class, saw an increased spread only for blow products relative to the Before Period, and an increased spread for batt products only relative to the After Period. (*Id.* at A-1169-1170).  The jury could well find that this pattern, with the spread higher for one product only relative to the year before the alleged conspiracy and for the other product only relative to the year after the alleged conspiracy, is essentially random and does not prove in any way that the alleged conspiracy caused impact.

- For a few contractors, such as Reilly & Colvin Insulation, Inc., the evidence is more consistent with plaintiffs' claims, with increases in the spread across both products, across the Before and After Period, and across most years.  (*Id.*, A-1170).

Each of these patterns is different, and a jury could easily find that the statistical evidence in Dr. Leitzinger's model with respect to these contractors is inconsistent with plaintiffs' claim that they were injured by the alleged conspiracy. But a different evaluation would need to be made of the results for each contractor,

since the pattern is different as to each.  This necessity to examine each individual contractor's circumstances defeats class certification.

### b. Because Masco Will Rebut The Leitzinger Model On A Contractor By Contractor Basis, Common Issues As To Impact Will Not Predominate At Trial

As plaintiffs concede (Pls.' Br. at 27), the Court should "consider not only the evidence presented in the plaintiff's case-in-chief but the defendant's likely rebuttal evidence" when determining whether common issues predominate for purposes of Rule 23(b)(3), *Rodney v. Northwest Airlines Inc.*, No. 04-5752, 2005 U.S. App. LEXIS 18242, *10. (6th Cir. 2005).  In *Rodney*, the Sixth Circuit rejected plaintiff's argument that the district court was only permitted to assess "the plaintiff's proffered method of providing his case-in-chief" when determining predominance and required a consideration of the defendants' evidence. *Id.* at * 9.

Similarly, in *Karofsky v. Abbott Labs.*, No. CV-95-1009, 1997 Me. Super. LEXIS 316, (Me. Super. Oct. 15, 1997), the court noted that "[t]he defendants in this matter are entitled to challenge plaintiffs' evidence and present evidence of their own with regard to each of the elements plaintiffs must prove in order to meet their burden."  The court denied plaintiffs motion to certify the class because the defendants' "full and fair defense" would cause the class action to "eventually degenerate into hundreds of different trials with the result that individual issues would overwhelmingly predominate over any issues common to the class."

To the same effect is *In re Hotel Telephone*, 500 F.2d 86, 89 (9th Cir. 1974) (denying class certification because of defendants' evidence), *Chestnut Fleet Rentals Inc. v. Hertz Corp.*, 72 F.R.D. 541, 548 (E.D. Pa. 1976) (denying class certification because "defendants will likely assert, airport by airport, defenses…[t]he applicability of these defenses can only be determined by applying them to the set of facts prevailing at any one airport") and *In re Transit Co.*, 67 F.R.D. 59, 73 (W.D. Mo. 1975) ("[T]he court cannot ignore the issues of fact which are likely to arise in defense of the class claims, and the Court cannot assume that these defendants will waive their opportunity to attempt to discover and present evidence relating to their dealings with the individual class members").

Thus, even if this Court were to determine, contrary to defendants' showing, that plaintiffs have presented a methodology of impact that uses common proof, the Court cannot certify the class if defendants will defend against that "proof" on a contractor by contractor basis. And that is exactly what Masco would do in this case. If the Leitzinger model were ever presented to a jury, Masco would defend against that model by presenting evidence as to each contractor to show that it was not impacted by the alleged conspiracy. This would include, among other things, the kinds of contractor specific analysis illustrated above for each of the 377 contractors. That analysis is certainly not common.

Masco would also use a variety of other evidence to explain the allegedly increased spreads that the Leitzinger model posits.  For some contractors, that result is solely due to differences in the products purchased during the two periods. For example, Adams Insulation bought two products during the Base Period, but nine during the affected period. (Kaplan II Rpt., A-507-A-508).  The "spread" for the two products purchased in both periods actually declined; the only reason that Dr. Leitzinger shows a spread increase for this contractor was that he includes seven new products during the Affected Period that Adams did not purchase during the Before or After Periods.  (*Id.*).  Masco is entitled to explain to the jury that this comparison involves "apples and oranges" and does not prove impact.  (*Id.*). Similarly, for contractor Fetterville Sales, Dr. Leitzinger calculated that its weighted average price increased by 8.9 cents between the base and affected periods, but that is because it stopped buying a relatively less expensive product. (Kaplan II Rpt., A-508-A-509).  For the only product that it purchased during both periods, the price that this contractor paid actually declined by almost 12 cents during the conspiracy.  (*Id.*).  Other examples of this weighting mistake are included in Exhibit 12 to the Kaplan Report.  (*Id.* at A-566-A-580).  Of course, each is specific to a particular contractor and therefore involves individual evidence.

Other individual analysis will arise because of Dr. Leitzinger's insistence on including contractors in the proposed class for whom he found a spread increase for either batt or blow, but not the other category. Dr. Leitzinger's model includes some contractors that experienced an increase in the spread on one product that was more than offset by a decrease in their spread on another product. (Kaplan II Rpt., A-511-A-512, A-592). For example, Smith Insulation experienced less than two-tenths of a cent per pound increase in its spread relative to Masco on blow, and Dr. Leitzinger included it in the class. (*Id.*). But the same contractor experienced a 3.8 cent decrease relative to Masco on its purchases of batt. (*Id.*). There are several other such examples. (*Id.* at A-592). Even putting aside the fact that such results are entirely inconsistent with the conspiracy alleged by plaintiffs, a jury would have to examine these divergent spreads on a contractor by contractor basis to determine whether any contractor was actually impacted by the conspiracy.

Masco will also rebut plaintiffs' statistical evidence with non-statistical evidence, i.e., documents and testimony that is specific to particular contractors and explains why those contractors did not in fact suffer any injury from the alleged conspiracy. This evidence, as well, will be highly individualized.

Mr. Kaplan identifies examples of this nonstatistical evidence in Section VII of his report. Masco will present the following types of evidence to the jury that negates the statistical evidence, such as it is, in Dr. Leitzinger's model:

- ABS Insulating, Inc.: CertainTeed and Johns Manville documents indicate that this contractor aggressively sought price concessions. (Kaplan II Rpt., A-519, A-520). The statistical evidence as to this contractors shows that its price from Johns Manville and Owens Corning actually decreased in the affected period. (*Id.*).

- Installed Building Products (IBP): Dr. Leitzinger found that, based on his statistical analysis, IBP did not experience a price increase relative to Masco on its purchases of blow insulation during the alleged conspiracy period, but included IBP in the proposed class based on their purchases of batt insulation. (*Id.* at A-523). A Johns Manville document dated January 23, 2001, identified as a "Price Request Form" and referring to "IBP," states with respect to pricing for certain blow products that "the key is to meet cellulose pricing" and that "cellulose has replaced a huge FG blow market share due to significantly lower pricing." (*Id.*). Mr. Kaplan found that, when performing Dr. Leitzinger's analysis on a manufacturer-by-manufacturer basis, the prices that IBP paid to both CertainTeed and to Johns Manville for batt insulation by this customer decreased during the affected period relative to the prices paid by Masco. (*Id.*). This evidence calls into question any claim that IBP was impacted by any conspiracy.

- Connecticut Home Insul Co.: Dr. Leitzinger found that this customer did not experience a relative price increase on its purchases of batt insulation, but included Connecticut Home Insulation in the proposed class based on their purchases of blow insulation. (*Id.* at A-520). A CertainTeed document dated July 28, 2000, identified as a "Report of Competition," requests lower pricing for certain batt insulation products for Connecticut Home Insulation to "capture increased batt volume." (*Id.*). Another CertainTeed document, also identified as a "Report of Competition" and with an effective date of September 16, 2004 (which would be included in Dr. Leitzinger's "base" period), reflects a request for a lower price for a blow insulation product, Insulsafe 4 ("IS4"), to "partially meet competition." (*Id.*). Knauf is

39

identified as the "competitor." (*Id.*). As indicated in Exhibit 12 of Mr. Kaplan's report, Dr. Leitzinger calculated a higher price for this customer across all blow products, whereas for Insulsafe 4, the only blow product purchased in both the base and affected periods, this customer experienced lower prices. (*Id.* at A-567). In addition, according to the results Dr. Rubinfeld includes in Exhibit 1 to his report, using Dr. Leitzinger's method, but considering each of the two "base" years separately, if only 2004 is used as the "base" period, the price paid for blow insulation by this customer during the "affected" period did not increase relative to the price paid by Masco. (*Id.* at 520; Rubinfeld II Rpt. at A-1193).

Fundamentally, defendants' rebuttal to the Leitzinger model would consist of a contractor by contractor explanation for the allegedly increased spread relative to Masco posited by Dr. Leitzinger. Such a defense is required both by the nature of the conspiracy plaintiffs allege and by the methodology of plaintiffs' expert. Plaintiffs themselves have created the scenario whereby Masco can and must rebut on an individual basis plaintiffs' claim that each such contractor was impacted by the alleged conspiracy. Thus, common issues would not predominate at trial on the issue of impact, and this Court should not certify the class.[19]

---

[19]   Plaintiffs also do not even attempt to propose any common method that will measure damages. Plaintiffs state that the standard that they must meet at this stage is "whether or not the proposed methods [for computing damages] are so insubstantial as to amount to no method at all." (Pls' Br. at 47 citing *Klay*, 382 F.3d at 1259.) But plaintiffs do not even meet their own standard. They assert that they have carried their burden on this issue at the class certification stage because "[u]sing statistical techniques similar to those he used to measure the changes in the class members' spreads relative to Masco, Dr. Leitzinger will be able to estimate damages." (Pls.' Br. at 47.) That is the entirety of the demonstration that they can prove damages using common proof.

**D.     Plaintiffs' Proffered Methodology Is Not Plausible And Therefore Cannot Support Class Certification**

As demonstrated above, neither Dr. Leitzinger's model nor Masco's response implicate a common method of proof, either of the alleged conspiracy itself or of impact upon each class member. Even more fundamentally, however, Dr. Leitzinger's statistical analysis cannot support a finding that plaintiffs have presented common evidence of impact because it is not a "plausible" methodology. As plaintiffs themselves concede, even a common methodology is not sufficient to meet the predominance test unless it is also plausible. (Pls.' Br. at 31.) This Court cannot simply accept Dr. Leitzinger's analysis without making a determination about whether that methodology accurately describes the market at issue, and whether the methodology is plausible. *Blades v. Monsanto*, 400 F.3d 562, 570 (8th Cir. 2005) (upholding trial court's rejection of Dr. Leitzinger's testimony on

---

This bare promise is completely insufficient to permit certification of a damages class. *Newton v. Merrill Lynch Pierce Fenner & Smith, Inc.* 259 F.3d 154, 187-88 (3rd Cir. 2001) (expert's averment that he could devise a damages formula could not support class certification on damages standing alone); *In re Medical Waste*, 2006 WL 538927 at *8 (D. Utah March 3, 2006) ("[i[ it simply not enough that Plaintiffs merely promise to develop in the future some unspecified workable damages formula"). Moreover, the "statistical technique" that Dr. Leitzinger employed of measuring only a change in spread relative to Masco does not address whether each class member paid a price higher than it would have absent a conspiracy, as he conceded (Leitzinger Dep., A-820) and therefore it cannot support a calculation of damages. Finally, whether or not any contractor suffered damages from the alleged conspiracy would present a host of individualized issues that would not permit a formulaic calculation of damages. (Kaplan I Rpt., A-87-A-88; Kaplan II Rpt., A-529).

impact).[20]  Dr. Leitzinger's model is unreliable and implausible for many reasons,[21] in addition to the fact that his approach masks highly divergent and often contrary results, as Dr. Rubinfeld has described.

First, the model has nothing to do with impact.  The fact that a contractor's spread may have increased during the alleged conspiracy period does not establish that that contractor paid a price higher than it would have paid in the absence of a conspiracy.  A contractor is injured if, and only if, it paid a price higher than it would have in the absence of a conspiracy.  *Robinson*, 387 F.3d at 422; *City of Pittsburgh*, 147 F. 3d at 265; *Exhaust Unlimited*, 223 F.R.D. at 513.

---

[20]     *See also In re Polymedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005) (overturning certification of class because the district court had not conducted an adequate inquiry into whether the factual prerequisites for an efficient market existed); *West v. Prudential Secur.*, 282 F.3d 935, 939-40 (7th Cir. 2002) (overturning grant of certification when the record did not support the fraud-on-the-market theory advanced by plaintiffs' expert and the expert failed to "test for and exclude other potential sources of price movement"); *In re Agricultural Chems. Antitrust Litig.*, 1995 U.S. Dist. LEXIS 21075, at * 25 (denying class certification when plaintiffs' expert merely assumed the impact existed and ignored many "marketplace realities" that suggested the contrary).

[21]     These arguments are set forth more fully in Defendants' Motion To Exclude the Expert Testimony of Jeffrey Leitzinger (D.I. 434).  However, this Court need not grant the *Daubert* motion in order to find that Dr. Leitzinger's model is not plausible and therefore cannot support class certification.  A court can reject the expert's analysis on the ground that it is insufficient as a matter of evidence without addressing whether it would satisfy the Daubert test for admissibility. *Blades*, 400 F.3d at 562 (rejecting Dr. Leitzinger's method as implausible without addressing *Daubert*).

Dr. Leitzinger himself admitted that a contractor's spread could have increased because the contractors' prices were not changed from the base period to the affected period, but Masco's price went down, or because contractors' prices and Masco's prices went down, but Masco's went down at a faster pace. (Leitzinger I Dep., A-801-A-802). He forthrightly admitted that he did not present "any statistical evidence that shows either that prices in the market went up, or that they were higher than they otherwise would have been." (*Id.* at A-820). Thus, his model cannot resolve the impact issue.

Second, Dr. Leitzinger's method is equally applicable to conspirators and nonconspirators. To succeed in a price fixing case, plaintiffs must prove that they sustained injury as a result of defendants' unlawful conduct. *Cable Holdings of Georgia Inc. v. Home Video, Inc.* 825 F.2d 1559, 1561 (11th Cir. 1987). Therefore, where an expert's method does not distinguish between lawful and unlawful conduct as potential causes of the alleged injury, it is "of absolutely no use to the factfinder." *Williamson Oil Co. Inc. v. Philip Morris USA*, 246 F.3d 1287, 1322-23 (11th Cir. 2003). Dr. Rubinfeld established that 90 contractors other than Masco increased their spreads relative to other proposed class members during the relevant period. (Rubinfeld I Rpt., A-1117-A-1118). In fact, he found stronger results for 10 contractors than Dr. Leitzinger obtained for Masco. (*Id.*). Dr. Leitzinger admitted that these results were not due to conspiracy. (Leitzinger I

43

Dep., A-821-A-822).   Thus, his method admittedly cannot demonstrate impact from a conspiracy, and instead shows other contractors "impacting" their competitors in the same way that Masco did.

Finally, Dr. Leitzinger's method is not plausible because he accepted uncritically the direction of plaintiffs' counsel in selecting the "Base Period" and "Affected Period," without any evidentiary basis.   (Leitzinger I Dep., A-840-A-841).   Such an approach fails the rigorous standards required for the application of a before and after model like his.   *See, e.g., Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1445 & fn. 32 (6th Cir. 1990) (rejecting benchmark as not comparable because expert's method for determining benchmark was "unsupported by the proof and highly conjectural"); *In re Aluminum Phosphide Antitrust Litigation*, 893 F. Supp. 1497, 1503 (D. Kan. 1995) (expert's opinion excluded because he had "no scientific or theoretical basis" for his selection of the "normative period," noting that "[the expert] failed to perform … relevant analysis, his choice of a normative period is not consistent with accepted economic practice.")

## II.   THIS COURT SHOULD REJECT PLAINTIFFS' NEW ATTEMPT TO OBTAIN CLASS CERTIFICATION ON THEIR VERTICAL CONSPIRACY CLAIMS

### A.   Plaintiffs Abandoned Any Argument To Obtain Class Certification On Their Vertical Conspiracy Claims

Plaintiffs argue that common issues predominate as to their claims of vertical conspiracies under Count 2 of their Amended Complaint. (Pls.' Br. at 46-47.) The Court should reject plaintiffs' attempt to obtain class certification on this claim because plaintiffs abandoned this argument more than a year ago. Plaintiffs did not move to certify a class under Count 2 in their original class certification motion and failed to submit any common proof that would establish impact under such a legal theory. (Pls.' Mem. In Supp. of Mot. To Certify Class, D.I. 347.)

Masco expressly stated its understanding that plaintiffs were not moving to certify a class under Count 2 in Masco's memorandum in support of motion for its summary judgment (D.I. 435 at fn. 16) and plaintiffs did not dispute this understanding in their opposition to Masco's motion. (Pls.' Opp. To Masco's Mot. For Summ. J., D.I. 446.) This Court also understood that plaintiffs had not moved for class certification under Count 2, anticipating at the class certification hearing that if Masco succeeded in defeating the class on the horizontal conspiracy, "we then would proceed on with some individual plaintiffs" on the vertical conspiracy claims. (Hearing Tr. (Comments of Hon. Julie E. Carnes), A-788.)

45

Moreover, plaintiffs now present arguments in support of certification of a class or sub-classes for a vertical conspiracy claim in direct contravention of the Court's admonishment that plaintiffs could not come back in the renewed motion for class certification with a "third theory." (Hearing Tr. (Comments of Hon. Julie E. Carnes), A-786.)  *See also id.* ("I mean we will have more conversation if there is a third theory or something here.")   While Masco believes that plaintiffs' eleventh hour attempt to gain certification of a vertical class should be disregarded (and perhaps sanctioned) by the Court, those arguments are unavailing in any event.

## B.   Plaintiffs Have Not Presented Common Proof That Would Support Class Certification On A Vertical Conspiracy

Putting aside that plaintiffs have attempted to do something that the Court ordered them not to do, they cannot meet the predominance requirement for the alleged vertical conspiracy.  This is true for all the reasons presented above, since impact is a critical element of vertical, as well as horizontal claims.  *See e.g. Agricultural Chems.*, 1995 U.S. Dist. LEXIS 21075, * 3-4 (refusing to certify class because plaintiffs failed to show classwide proof of common impact for vertical and horizontal conspiracy claims).

Moreover,  "vertical price restraints are to be judged by the rule of reason." *Leegin Creative Leather Prods. v. PSKS Inc.*, 127 S. Ct. 2705, 2710 (2007).  The rule of reason requires "the finder of fact [to] decide whether the questioned

46

practice imposes an *unreasonable* restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Spanish Broadcasting Sys. of Fla. v. Clear Channel Communications*, Inc., 376 F.3d 1065, 1071 (11th Cir. 2004) (emphasis in original).

Rule of reason analysis is virtually never susceptible to class action treatment because it requires multiple individualized inquiries. *See Weisfeld v. Sun Chem. Corp.*, No. 02-4478, 2004 U.S. App. LEXIS 277 (3rd Cir. Jan. 9, 2004); *In re Comp. of Managerial, Prof. and Technical Employees Antitrust Litig.*, No. 02-2924, 2003 U.S. Dist. LEXIS 22836 (D.N.J. May 22, 2003); *In re Beer Distrib. Antitrust Litig.*, 188 F.R.D. 557, 563-64 (C.D. Cal. 1999) (rejecting class certification for horizontal conspiracy allegation brought under rule of reason because it would "necessarily involve an examination of hundreds of individual relationships between Anheuser-Busch and its independent distributors").

Testing plaintiffs' theories here under a rule of reason analysis would involve multiple individual inquiries into the structure and competitive conditions within allegedly affected localized markets, interaction of suppliers on the local level, influence of competition from non-fiberglass products, availability of purchases from non-defendant suppliers and distributors/retailers, whether there

were geographic markets in which a manufacturer did not sell to Masco (as well as specific products and time periods that manufacturers did not sell to Masco), manufacturer shares in local markets, the pricing of insulation in those markets, the presence of economic barriers inhibiting the ability of competitors to respond and offset the challenged practice, and business justifications specific to each market. (*See e.g.* Kaplan Rpt. I, A-25-A-26).  Though plaintiffs off-handedly assert that the Court could certify "sub-classes," Dr. Leitzinger does not present *any* statistical analysis on an individual manufacturer basis that would support such sub-classes. In short, plaintiffs' last minute plea for certification of their vertical claims is baseless, and bespeaks recognition that the horizontal conspiracy claims for which they have previously sought certification are also doomed.

## III.   A CLASS ACTION IS NOT THE SUPERIOR METHOD OF ADJUDICATING THIS DISPUTE

Plaintiffs argue that a class action is a superior method of resolving this dispute because "individual class members would not be able or willing to incur the cost of bringing an individual case."  (Pls.' Br. at 50.)  However, the named plaintiffs here are private companies that have grossed millions of dollars of sales and gross profits during the relevant period.[22]  Several of these plaintiffs actually filed their own cases (as did Wilson Insulation) before choosing to spearhead this

---

[22]    A-883; A-909-A-916; A-924-A-932; A-1054-A-1061; A-1074-A-1095; A-1096-A-1106.

class action, demonstrating that plaintiffs do not need the vehicle of a class action to pursue their claims. *See Lundquist v. Sec. Pacific Auto. Fin. Servs., Corp.*, 1992 U.S. Dist. LEXIS 22843, at *9 (D. Conn. June 9, 1992) (recommending denial of class certification where there was "no evidence of impoverishment or the inability of any putative plaintiff to pursue an action independently"). These plaintiffs also seek a substantial incentive payment from the settlements that this Court has already approved that will permit them to finance the trial, the only remaining event in this case.[23]

In any event, because plaintiffs' claims would require contractor by contractor presentation at trial, a class action here would be hopelessly unmanageable and could never be a superior means for resolving this dispute. *See Andrews v. AT&T*, 95 F.3d 1014, 1023 (11th Cir. 1996) (where "as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues" class certification is inappropriate); *Blue Bird*, 573 F.2d at 328 ("if the effect of class certification is to bring in thousands of possible claimants whose presence will in actuality require a

---

[23]    *Minnesota v. United States Steel Co.*, 44 F.R.D. 559 (D. Minn. 1968) does not support plaintiffs position.  There, the named plaintiffs—state and local governmental entities—could not afford to proceed separately against the six major steel companies "without the financial aid made possible by the class action device." *Id.* at 572.

multitude of mini-trials . . . , then the justification for class certification is absent.").[24]

## CONCLUSION

For the reasons stated, Masco respectfully requests that this Court deny plaintiffs' renewed motion for class certification.[25]

DATED:  August 9, 2007             Respectfully submitted,

S. Wade Malone *by nmb w/express permission*

Margaret M. Zwisler
William R. Sherman
Eric J. McCarthy
LATHAM & WATKINS LLP
555 Eleventh Street, N.W. Suite 1000
Washington, DC 20004-1301
Tel.:  (202) 637-2200
Fax:  (202) 637-2201

S. Wade Malone (Bar. No. 468015)
NELSON MULLINS RILEY &
SCARBOROUGH
999 Peachtree Street, N.E.
First Union Plaza, Suite 1400
Atlanta, GA 30309-3964

---

[24]     In a footnote, plaintiffs claim that they are entitled to class certification on their claim for an injunction. (Pls.' Br. at 35).  However, plaintiffs do not address, much less satisfy, the requirements of class certification of an injunction class.  For example, cases that primarily seek damages are not appropriate for certification.  *See* Fed.R.Civ.P. 23 Advisory Committee Notes; *Cooper v. Southern Co.*, 390 F.3d 695, 720 (11th Cir. 2004) reversed in part on other grounds, *Ash v. Tyson Foods, Inc.* 546 U.S. 454 (2006).  Moreover, plaintiffs cannot satisfy the "cohesiveness" requirement for an injunctive class given that they are competitors themselves. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412-13 (5th Cir. 1998).

[25]     Pursuant to L.R. 5.1 and L.R. 7.1, Masco certifies that this Opposition was prepared in Times New Roman 14-point type.

Tel:  (404) 817-6000
Fax: (404) 817-6050

**Attorneys for Masco Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing DEFENDANTS' OPPOSITION

TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION were

served on August 9, 2007 via U.S. mail on the following:

Michael B. Terry
Frank M. Lowrey
Steven J. Rosenwasser
Ronan P. Doherty
BONDURANT, MIXSON &
ELMORE, LLP
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3417
Tel: (404) 881-4100
Fax: (404) 881-4111

Craig G. Harley
James M. Wilson, Jr.
CHITWOOD HARLEY HARNES, LLP
2300 Promenade II
1230 Peachtree Street
Atlanta, Georgia  30309
Tel: (404) 873-3900
Fax: (404) 876-4476

Jeffrey L. Berhold
JEFFREY L. BERHOLD, P.C.
1360 Peachtree Street, N.E.
Suite 930
Atlanta, Georgia  30309
Tel: (404) 872-3800
Fax: (404) 872-6984

*For Plaintiffs*

Tony G. Powers
Kimberly L. Myers
John J. Almond
Phillip S. McKinney
ROGERS & HARDIN LLP
2700 International Tower
229 Peachtree St., N.E.
Atlanta, Georgia 30303
Tel: (404) 420-4632

*For Defendant Johns-Manville*

| | |
|---|---|
| Corey C. Watson | C. David Vaughan |
| Russell A. Archer | Charles C. Murphy, Jr. |
| Tina Hernandez | Ellen G. Schlossberg |
| KIRKLAND & ELLIS LLP | Vaughan & Murphy |
| 777 South Figueroa Street, Suite 3400 | 260 Peachtree St., Suite 1600 |
| Los Angeles, California 90017 | Atlanta, GA 30303 |
| Tel: (213) 680-8400 | Tel: (404) 577-6550 |

*For Defendant Guardian Fiberglass,*
*Inc.*

June Ann Sauntry
James Andrew Lamberth
Timothy J. Kozik
TROUTMAN SANDERS LLP
600 Peachtree Street N.E., Suite 5200
Atlanta, Georgia 30308-2216
Tel: (404) 885-3210

*For Defendant CertainTeed*
*Corporation*

| | |
|---|---|
| Donald E. Knebel | Daniel Patrick Griffin |
| Kendall Millard | Miller & Martin |
| Deborah Pollack-Milgate | 1170 Peachtree St., N.E. |
| Lynn C. Tyler | Suite 800 |
| Hongsun Yoon | Atlanta, GA 30309 |
| BARNES & THORNBURG, LLP | Tel: (404) 962-6100 |
| 11 S. Meridian St. | |
| Indianapolis, IN 46204-3535 | |
| Tel: (317) 236-1313 | |

Daniel Gravelyn
BARNES & THORNBURG, LLP
300 Ottawa Avenue, NW., Suite 500
Grand Rapids, MI 49503
Tel: (616) 742-3930

*For Defendant Knauf Insulation GmbH*

S. Wade Malone    by nmB
                  w/express
                  permission

S. Wade Malone
Georgia Bar. No. 468015